IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| DOUGLAS J. GRYCZA, | ) | CASE NO. 3:14-cv-01485 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Douglas J. Grycza ("Plaintiff" or "Grycza") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

Upon review of this matter, the undersigned finds that the Administrative Law Judge ("ALJ") did not properly adhere to the treating physician rule when considering and weighing opinion evidence offered by treating source Dr. Joy Barnes, M.D., and did not adequately account for or explain how the RFC accounted for Grycza's limitations in concentration, persistence, or pace as found by the ALJ and as contained in medical opinion evidence relied upon by the ALJ.  Accordingly, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED**.

## I.  Procedural History

Grycza protectively filed applications for DIB and SSI on November 24, 2010.[1]  Tr. 15, 179, 183, 226.  He alleged a disability onset date of November 1, 2008 (Tr. 15, 179, 183, 226) and alleged disability due to herniated lower lumbar, nerve damage right leg, liver and stomach problems, depression, anxiety, and panic attacks (Tr. 64, 96, 128, 134, 226).  After initial denial by the state agency (Tr. 94-95, 128-133) and denial upon reconsideration (Tr. 126-127, 134-136), Grycza requested a hearing (Tr. 139).  A hearing was held before ALJ James B. Griffith on December 11, 2012.  Tr. 39-63.

In his February 7, 2013, decision, the ALJ determined that Johnson had not been under a disability from November 1, 2008, through the date of the decision.  Tr. 12-37.  Grycza requested review of the ALJ's decision by the Appeals Council.  Tr. 6-11.  On May 2, 2014, the Appeals Council denied Grycza's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Grycza was born in 1981.  Tr. 43, 179, 183, 226.   He was 31 years old at the time of the hearing and was married but separated.  Tr.  43.  At the time of the hearing, he was living in an apartment with his girlfriend.  Tr. 43-44, 48.  Grycza's highest level of education was one year of college at a community college.  Tr. 44.  He last worked in late September/early October of 2011 at Sofo Foods driving a forklift, picking up pallets and dropping them at trucks.  Tr. 44.  That job

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 6/1/2015).

lasted less than two months and ended because Grycza's back gave out and he required surgery. Tr. 44-45.  Prior to working for Sofo Foods, Grycza worked at Little Caesars in 2010 for about two months.  Tr. 45.  Grycza was let go from Little Caesars because he was unable to keep up with the work.  Tr. 45.  Prior to 2010, he last worked in 2008 at Prestige Store Interiors, working there for about 10 or 11 years.  Tr. 45.  He started as a cabinetmaker and worked his way up to CNC (computer numeric control) operator.  Tr. 45, 561.  He stopped working at Prestige Store Interiors because he was in too much pain and was unable to do all the lifting that the job required and was missing work for doctor appointments so the company laid him off and eventually terminated him.  Tr. 45-46.

**B.      Medical evidence**

        **1.      Treatment history**

                **a.      Physical impairments**

In early 2004, Grycza had back surgery at the L4-L5 level, which was performed by Dr. Michael A. Healy, M.D.  Tr. 376, 380-381, 388.    In September and October of 2004, Grycza was reporting significant problems with his back and pain in his buttocks and leg while working. Tr. 383-384.  Dr. Healy recommended an MRI.  Tr. 383.  On November 10, 2004, Dr. Healy saw Grycza and noted that the MRI did not show any large disc herniation but Grycza did have some scarring in the area and some disc degeneration at the L4-L5 level.  Tr. 382, 763-764.  Dr. Healy recommended a course of lumbar epidural steroids and, if that was not successful, Dr. Healy indicated that fusion at the L4-L5 level may need to be considered.  Tr. 382.

Beginning in 2004, Grycza started treating with primary care physician Dr. William Facey, M.D., at the Family Practice of Toledo.  Tr. 861, 863.  He was first seen as a new patient on June 29, 2004, and continued treating with Dr. Facey through 2011.  Tr. 834, 863.  Upon

referral by Dr. Facey, on December 12, 2005, Grycza saw Dr. Ashok R. Salvi, M.D., of

Advanced Pain Management, LLC, for complaints of low back pain radiating into Grycza's right

lower extremity.  Tr. 337-339.  Grycza reported a burning, aching, stabbing pain that radiated

into his knee and he also reported weakness in his lower extremity.  Tr. 337.  Dr. Salvi examined

Grycza and assessed postlaminectomy syndrome and right-sided radiculopathy.  Tr. 338.  Dr.

Salvi's recommendations included exercises, twice each day; continuation of Vicodin;

consideration of long-acting opiates at the next visit; Lyrica twice each day; medial branch

blocks in the lumbar region and possibly radiofrequency if Grycza obtained even temporary

relief from the medial branch blocks; and consideration of fusion surgery but with a notation that

Grycza was reluctant to have another surgery.  Tr. 338.

On May 16, 2006, Grycza saw Dr. Salvi for follow up.  Tr. 335-336.  Grycza reported

that the methadone seemed to help[2]  but the Vicodin did not seem to help as much.  Tr. 335.

However, he reported intense back pain in the afternoon because his medications seemed to wear

off.  Tr. 335.  On examination, Grycza showed tenderness to palpation in the lumbosacral area;

there was a positive straight leg raise at 70 degrees; there was right sacroiliac joint tenderness;

and a positive right facet loading test.  Tr. 335.  Dr. Salvi recommended an epidural steroid

injection; continuation of Vicodin; an increase in the methadone dosage amount; and back

exercises.  Tr. 336.  Grycza continued treatment with Dr. Salvi through 2007 reporting increased

pain levels, problems sleeping, and back and leg spasms.  Tr. 341-344, 345-347, 348-350, 351-

353, 354-356, 357-359, 360-362, 363-365.  In August 2007, Dr. Salvi ordered an MRI of the

lumbar spine, which showed no focal disc protrusion or severe central canal narrowing; post-op

changes at the L4 level were unchanged since October 2005; there was mild diffuse annular disc

---

[2] It is not clear in the record when Grycza first started taking methadone.  At Grycza's December 2005 visit with Dr. Salvi, Dr. Salvi prescribed Vicodin.  Tr. 338.  Dr. Salvi mentioned the possibility of starting Grycza on long-acting opiates but did not specifically reference methadone. Tr. 337-338.

bulge at the L5-S1 interspace causing a minimal amount of mass effect upon the ventral thecal sac; and there was a small amount of enhancement along the posterior aspect of the disc, more on the right at the L4-5 interspace related to prior surgery.  Tr. 771.

On October 10, 2008, Dr. Lee, M.D., of Integracare Pain Relief Center, administered a sacroiliac joint injection.  Tr. 775.  On referral by Dr. Lee, an EMG was conducted on October 21, 2008, to rule out nerve damage.  Tr. 748-749.  The EMG revealed evidence of right, chronic L4/5 and a left, acute S1 radiculopathy.  Tr. 749.  There was no electrodiagnostic evidence of mononeuropathy or polyneuropathy of the tested extremities.  Tr. 749.

On November 7, 2008, Grycza returned to see Dr. Healy with reports of increasing problems over the prior months.  Tr. 380-381.  Grycza indicated he had had two major falls.[3]  Tr. 380.  He also reported that therapy and pain management were not helping.  Tr. 380.  Grycza also reported having problems with depression and waking up out of a dead sleep and vomiting.  Tr. 380.  On physical examination, Dr. Healy observed that Grycza showed some memory issues and had a blunted affect; Grycza's gait was slightly ataxic; his reflexes in the upper and lower extremities were hyperactive; there was some minor triceps weakness on the left side; there was no clear lower extremity weakness; Grycza could toe and heel walk without difficulty; there was no real straight leg raising sign or sensory loss.  Tr. 380-381.  Dr. Healy's review of an MRI showed some minor postsurgical changes at the L4-L5, with more on the right than left.  Tr. 381.  Dr. Healy recommended an MRI of the cervical spine as well as a CT scan of the head to assess the vomiting issue.  Tr. 381.  On November 19, 2008, Grycza met with Dr. Healy.  Tr. 379.  Dr. Healy reviewing the cervical MRI and CT scan and found no issues.  Tr. 379.  Dr. Healy again

---

[3] On September 29, 2008, Grycza sought emergency room treatment for low back pain radiating into his right leg that started following a fall, which occurred when his right leg gave out on him.  Tr. 376.  Also, on October 28, 2008, Grycza sought emergency room treatment following a fall down 12 steps when his back gave out on him.  Tr. 443.

reviewed the lumbar spine MRI as well as the radiologist's reading of that MRI and concluded that there was nothing to indicate that Grycza required repeat surgery in his lumbar spine.  Tr. 379.  However, Dr. Healy recommended that Grycza see a neurologist and undergo a repeat EMG.  Tr. 379.

Upon referral of Dr. Facey, Grycza saw Robert L. Kalb, M.D., of Bone Joint and Spine Surgeons, on December 23, 2008, for an evaluation of his back pain.  Tr. 516-518.  On physical examination, Dr. Kalb noted that Grycza's heel-toe gait was limited; twisting, stooping, and side-bending were limited in the lumbar and thoracic spine; and there was a limp present.  Tr. 517.  Otherwise, Grycza's physical examination generally showed normal findings.  Tr. 517.  Dr. Kalb reviewed the past MRI results and obtained x-rays of the hip and pelvis.  Tr. 518.  Dr. Kalb noted that the October 2008 lumbar spine MRI showed postsurgical changes and annular bulge without protrusion or displacement of the descending or exiting nerve root and the November 2008 cervical spine MRI was normal.  Tr. 517-518.  The x-rays taken that date were normal.  Tr. 518.  Dr. Kalb's diagnosis was low back pain, S/P L4-5 diskectomy/laminectomy with Dr. Healy, worse post op; left forearm staph infection; and right hip bursitis.  Tr. 518.  Dr. Kalb ordered a discogram/CT and counseled Grycza regarding weight reduction in order to decrease joint force and to increase walking exercise.  Tr. 518.

On January 5, 2009, Grycza met with orthopedic surgeon Van B. Boggus, M.D., for a second opinion regarding his spine.  Tr. 441-442.  Grycza reported that he had a lumbar brace but that its use only increased his pain.  Tr. 441.  Dr. Boggus indicated that Grycza's range of motion was excellent and, on flexion, Grycza was able to touch his toes and extension was normal. Tr. 441.  His straight leg raise was 60 degrees on the left and 45 degrees on the right.  Tr. 441.  Grycza's L1-S1 was normal and there was no evidence of lateralized radiculopathy or

myopathy in motor, sensory and reflex and no pain on hip flexion, internal rotation.  Tr. 441.  Dr. Boggus' assessment regarding Grycza's spine was chronic right sciatica, status post L4-5 microdiscectomy.  Tr. 442.  Dr. Boggus did not believe that Grycza had a surgical problem at the time and he encouraged Gyrcza to contact a chiropractor to see if adjustments could help or to obtain a discogram of the L4-5 to determine if surgery might be warranted.  Tr. 442.

On January 15, 2009, Grycza proceeded with the discogram/CT.  Tr. 469-479.  There was partial recreation of Grycza's symptomology upon injection at the L4-L5 and L5-S1 levels.  Tr. 470, 472, 474, 476.  No symptomology was recreated with injection at the L3-L4 level.  Tr. 470, 472, 474, 476.  There appeared to be a broad based disc bulge at the L4-5 level with possible mild encroachment into the existing neural foramina, right greater than left and a mild broad based disc bulge at the L5-S1 level, slightly effacing the thecal sac, but no evidence of exiting neural foraminal encroachment.  Tr. 477, 479.  There was no evidence of severe degenerative disc disease.  Tr. 470, 472, 474, 476, 477, 479.

Grycza continued treating with Dr. Kalb in 2009.  Tr. 522-555.  Grycza generally reported a pain level in the range of 6-8 out of 10.  Tr. 520, 529, 532, 535, 539, 545, 549, 552.  Dr. Kalb's examination findings throughout 2009 were similar to his December 2008 findings.  Tr. 517, 524, 527, 530, 533, 537, 540, 543-544, 547, 550, 554.  During an April 2009 visit, Dr. Kalb reviewed the results of the discogram/CT scan.  Tr. 527-528.  Dr. Kalb added a positive CT discogram L4-5 to his prior diagnoses but continued with his prior recommendation that fusion at L4-5 should be considered as a last resort and fusion at L5-S1 should be avoided at Grycza's age.  Tr. 525, 528.  In June 2009, Dr. Kalb prescribed 4-6 weeks of physical therapy for Grycza's low back/right hip.  Tr. 541.  During a July 14, 2009, visit with Dr. Kalb, Grycza reported that his condition had improved but he had been in a motor vehicle accident on July 4, 2009.  Tr. 542.

His reported pain level during the July 14, 2009, visit was 5 out of 10.  Tr. 542.  Dr.  Kalb continued with his prior recommendation that fusion at L4-5 should be a last resort and fusion at L5-S1 should be avoided at Grycza's age.  Tr. 544.  During August and September 2009, office visits, Dr. Kalb noted that Grycza was considering L4-5 fusion.  Tr. 548, 551, 555.

Also, in May 2009, Grycza sought treatment through the University of Toledo Medical Center's Physical Medicine and Rehabilitation Center with complaints of low back and right lower limb pain.  Tr. 928-930.  Dr. Patel examined Grycza and his impression was that Grycza's lumbrosacral pain was most likely a symptomology of lumbar diskogenic pain syndrome at L5-S1 and his right lower limb symptoms were most likely a symptomology of somatic referral for lumbar diskogenic pain syndrome versus S1 radicular pain either secondary to intraneural fibrosis, perineural fibrosis, or new focal disk protrusion at L5-S1.  Tr. 929.  Dr. Patel recommended further testing to determine whether surgery was needed and prescribed OxyContin and Oxycodone as needed for pain.  Tr. 929.   On December 23, 2010, Grycza also sought treatment at the University of Toledo Medical Center.  Tr. 925.  He saw Dr. Mustafa H. Khan, M.D., in the orthopedics department with reports of neck and low back pain.  Tr. 925-926.  Dr. Khan assessed neck muscle tension and migraine headaches and low back S1 radiculopathy in the right leg and low back pain.  Tr. 926.  Dr. Khan recommended an MRI for Grycza'a lumbar spine and physical therapy and a TENS unit for his neck.  Tr. 926.  The MRI showed no acute fractures; no evidence for pathological range of motion; and minimal disc space narrowing.  Tr. 927.

Upon referral by Dr. Facey, on January 10, 2011, Grycza was examined by neurologist Mahmoud S. Mohamed, M.D., MAAN, of the Comprehensive Neurology & Headache Center. Tr. 742-743.  Grycza reported last attempting physical therapy two years prior and indicated that

physical therapy made his symptoms worse.  Tr. 742.  Grycza reported having significant difficulty with activities of daily living.  Tr. 742.  On physical examination, Grycza had tenderness in the lumbosacral areas with a lot of spasms and his range of motion was limited, bending, extending or laterally rotating his back.  Tr. 742.  Grycza also exhibited give away weakness in his right lower extremity; a positive straight leg raise; and mild weakness to foot dorsiflexion. Tr. 742.  His deep tendon reflexes showed decreased right knee jerk and sensory examination showed decreased sensation on the outer aspect of his right leg.  Tr. 742.  His gait was significantly stiff.  Tr. 742.  Dr. Mohamed's assessment included a finding of low back pain with lumbar neuritis, secondary to an L4-5 disc status post surgery; L5-S1 herniated disc; and failed low back surgery syndrome.  Tr. 742.  Dr. Mohamed recommended an EMG and nerve conduction studies and a repeat MRI.  Tr. 742-743.  For treatment, Dr. Mohamed put Grycza back on OxyContin twice a day and prescribed Vicodin for breakthrough pain.  Tr. 743.  On January 19, 2011, an EMG and nerve conduction studies of the bilateral lower extremities and lumbar paraspinal muscles were conducted.  Tr. 746-747.  The results showed electrodiagnostic evidence of a right, chronic L4-5 lumbar radiculopathy, which Dr. Mohamed indicated should explain Grycza'a complaints of low back pain with shooting pain down the right lower extremity. Tr. 747.

On January 26, 2011, Grycza saw Dr. Mohamed.  Tr. 741.  Grycza reported that OxyContin 20 mg four times a day was helping a lot, indicating that he was able to function.  Tr. 741.  On examination, Grycza had a decreased range of motion, especially to bending.  Tr. 741.  He showed give away weakness in his right leg; his gait was steady but stiff.  Tr. 741.  Dr. Mohamed again assessed failed low back syndrome and low back pain with lumbar neuritis.  Tr. 741.  Dr. Mohamed prescribed OxyContin 20 mg to take two tablets a day with instructions to

9

follow up in one month.  Tr. 741.  Grycza continued to see Dr. Mohamed through June 2011.  Tr. 736-740.  In April 2011, Grycza reported that he had tried Klonopin for his nerve pain and it was helping.  Tr. 738.  He was also taking Oxycodone up to three times a day, which was also helping.  Tr. 738.  Dr. Mohamed provided Grycza with refills for Oxycodone and Klonopin.  Tr. 738.  Dr. Mohamed treated Grycza in May but, on June 14, 2011, Dr. Mohamed discharged Grycza as a patient because Grycza had violated his narcotics contract by obtaining narcotics from many different physicians.  Tr. 736.

On June 22, 2011, Grycza started treatment with pain management physician James Bassett, Jr., M.D., of Complete Pain Care, L.L.C.  Tr. 744-745, 778-779.  On examination, Grycza's back was non-tender throughout.  Tr. 745.  Straight leg raises were negative bilaterally.  Tr. 745.  Grycza exhibited pain with both forward flexion and extension of the lumbar.  Tr. 745.  Motor, sensory, and reflexes were within normal limits in the lower extremities.  Tr. 745.  Dr. Bassett assessed postlaminectomy syndrome of the lumbar spine noting that Grycza had had extensive conservative as well as surgical treatments without control of his symptoms.  Tr. 745.  Dr. Bassett recommended that Grycza start on methadone.  Tr. 745.  On July 7, 2011, Grycza saw Dr. Bassett and reported that his medications were not controlling his symptoms.  Tr. 777.  Dr. Bassett was concerned that Grycza was taking more than the prescribed amounts of his medications and cautioned Grycza that if he continued to use more than the prescribed amounts Dr. Bassett would be unable to continue to treat him. Tr. 777.  Dr. Bassett discontinued the methadone and started OxyContin 30 mg q.12h  Tr. 777.  A few weeks later, on July 26, 2011, Grycza reported to Dr. Bassett that the OxyContin was controlling his symptoms better than the methadone but it only seemed to last 7-8 hours.  Tr. 990.  Dr. Bassett adjusted the OxyContin dose and intervals to 20 mg q.8h. and added Cymbalta 60 mg.  Tr. 990.

On November 29, 2011, Grycza saw Dr. Ashok Biyani, M.D., for his history of right-sided leg pain and low back pain. Tr. 875. Grycza reported that he was only taking over-the-counter medication at that time to control his pain. Tr. 875. On examination, Grycza had full strength in his lower extremities; sensation was grossly intact; reflexes were +2 bilaterally; he had negative straight leg raises bilaterally; and he was able to stand on his heels and toes and walk a tandem line without difficulty. Tr. 875. Dr. Biyani indicated that Grycza's lumbar spine x-rays showed good alignment of the vertebral bodies, no acute fractures, dislocations, or bony destructive processes. Tr. 875. Dr. Biyani assessed "low back pain, lumbar radiculopathy." Tr. 875. Dr. Biyani recommended an MRI of the lumbar spine which was performed on December 6, 2011. Tr. 873, 875. On December 6, 2011, Dr. Biyani reviewed the MRI scan indicating that it showed "degenerative disk disease at L4-5 with recurrent herniation on the right-sided L4-5 segment." Tr. 874. Grycza reported severe pain at a December 6, 2011, visit. Tr. 874. Dr. Biyani recommended a diskectomy and a fusion at L4-5. Tr. 874.

On December 3, 2011, Grycza was treated at the emergency room for complaints of chronic back pain going down his right leg that had worsened over the past two weeks and significantly overnight. Tr. 870. Grycza was prescribed Flexeril and advised to follow up with his primary care physician. Tr. 870-871.

On January 8, 2012, Dr. Biyani performed transforaminal lumbar interbody fusion surgery at the L4-5 level. Tr. 887, 893. Grycza was discharged on January 12, 2012, with his pain being controlled with fentanyl. Tr. 887. Grycza saw Dr. Biyani for a post-op follow up appointment on January 24, 2012. Tr. 919. Grycza was taking up to 6 Percocet per day. Tr. 919. He denied lower extremity complaints. Tr. 919. His severe pre-surgery leg pain had pretty much resolved. Tr. 919. Dr. Biyani noted that Grycza was making good progress and

advised that he should gradually increase his activities.  Tr. 919.  Dr. Biyani also gave Grycza 40 Percocet pills and 40 Ultram pills and directed him to continue to take Zanaflex.  Tr. 919.

Grycza first saw Dr. Joy Barnes, M.D., on February 2, 2012, for a new patient visit.  Tr. 920-922.  Dr. Barnes noted that Grycza walked with a slight limp but had no mobility limitations.  Tr. 922.  She also noted that Grycza required use of a cane.  Tr. 922.  His upper and lower extremity strength testing was 5/5 symmetric bilaterally; his reflexes were 2+ and symmetric and his sensory exam was normal.  Tr. 922.  Dr. Barnes assessed generalized anxiety disorder, noting that his condition was stable at that time.  Tr. 922.

Grycza was continuing to see Dr. Biyani and, on February 21, 2012, reported that he was having significant back pain and some right leg discomfort.  Tr. 923.  On examination, Grycza's strength was 5/5 in his lower extremities; his sensation was grossly intact; reflexes were 2+ bilaterally; straight leg raises were negative; and lumbar spine x-rays showed good position of the hardware and graft.  Tr. 923.  Dr. Biyani advised Grycza to continue on Vicodin and he also gave him Ultram, Neurontin and a Medrol Dosepak.  Tr. 923.  Dr. Biyani advised that he wanted Grycza to wean himself off of his lumbar brace and he should follow up in 6 weeks.  Tr. 923.

On March 7, 2012, Grycza saw Dr. Barnes with complaints of back pain and a desire to discuss pain medication. Tr. 951.  Grycza  reported considerable pain at the base of his back but noted that he had good days and bad days.  Tr. 951.  Grycza reported to Dr. Barnes that Dr. Biyani advised him that since he was 6-weeks post surgery he needed to discuss pain medications with his primary care physician.  Tr. 951.  On examination, Grycza's gait was normal; he had no mobility limtiations; and his upper and lower extremity testing was 5/5 and symmetric bilaterally.  Tr. 953.  Grycza's range of motion was painful.  Tr. 953.  Dr. Barnes recommended physical therapy as soon as possible for his back pain.  Tr. 953.  Dr. Barnes

indicated that she would not prescribe pain medication for him because he should be better after the surgery.  Tr. 953.  Dr. Barnes discussed with Grycza the possibility that his anxiety might be playing a part in his pain.  Tr. 953.  She recommended that he see a counselor.  Tr. 953.

Upon referral by Dr. Barnes, on March 22, 2012, Grycza saw Dr. John Dooner, M.D., of Mercy St. Vincent Medical Center, for evaluation of his back pain.  Tr. 955-956.  Grycza described his pain in his right leg as achy.  Tr. 955.  He described the pain in his lumbar area as sharp not stabbing.  Tr. 955.  Grycza estimated being able to walk at best 2 blocks at a time.  Tr. 955.  He rated his pain level as a 7 out of 10.  Tr. 955.  On examination, straight leg raising was positive.  Tr. 956.  Dr. Dooner indicated that Grycza was not a candidate for interventional procedures at that point and instead needed to have the behavioral component of his pain addressed first, especially in light of the fact that he was just 2 months post-surgical intervention. Tr. 956.  Dr. Dooner felt that, because of a possible opioid dependence, Grycza should be followed in an opioid maintenance program and the Suboxone that another physician had prescribed should provide Grycza with adequate pain relief.  Tr. 956.  Dr. Donner advised Grycza to follow up with the physician already prescribing Suboxone and to follow up on other issues regarding his history of anxiety and depression.  Tr. 956.

On April 3, 2012, Grycza reported to Dr. Biyani that he felt that he was doing better than he was at the visit 6-weeks prior.  Tr. 982.  His leg pain was continuing to bother him but it was much less.  Tr. 982.  Grycza reported being able to stand up straight and walk longer distances.  Tr. 982.  He was trying to increase his activity gradually.  Tr. 982.  He was continuing to take Suboxone as prescribed by his pain management physician. Tr. 982.  Physical examination findings included 5/5 strength in bilateral lower extremities; sensation intact grossly; reflexes 2+ bilaterally; and negative straight leg raises bilaterally.  Tr. 982.  Dr. Biyani indicated that he

wanted Grycza to continue getting pain medication from his pain management physician and to continue to gradually increase his level of physical activity.  Tr. 982.  Dr. Biyani provided Grycza with a one-time prescription for Ultram and advised him to follow up in 3 months.  Tr. 982.

On August 2, 2012, Grycza sought treatment with Dr. Barnes.  Tr. 984-987.  He complained of pain under his right rib, nausea and diarrhea.  Tr. 984.  Dr. Barnes noted that lumbar disc degeneration and congenital fusion of the vertebrae were among Grycza's active problems.  Tr. 984.  Dr. Barnes noted that Grycza was alert, in no acute distress, well-nourished and developed, and healthy appearing.  Tr. 986.  Dr. Barnes's assessment was abdominal pain in the right upper belly.  Tr. 986.  Upon Dr. Barnes's referral, Grycza was seen by Dr. Jennifer Grogan, M.D., for assessment of his right upper quadrant pain radiating into his back.  Tr. 991. Dr. Grogan assessed possible gallbladder polyp versus a symptomatic cholelithiasis.  Tr. 991. Grycza elected to undergo a laparoscopic gallbladder cholecystectomy, which was performed on September 10, 2012 (Tr. 992-1020), and showed mild chronic inflammation, but no stones (Tr. 992).  On physical examination at that time, Grycza had full range of motion in all four extremities but a slightly unsteady gait with a significant limp.  Tr. 997, 1001.

On December 4, 2012, Grycza saw Dr. Janis E. Zimmerman, M.D.,[4] for the first time with complaints of stiffness and pain in his lower back and on and off pain in his right leg.  Tr. 1032-1033.  Grycza also complained of anxiety and panic attacks.  Tr. 1032.  On physical examination, Grycza had mild tenderness in his lower back and right paraspinal area but normal range of motion and negative straight leg raise test.  Tr. 1032.  Dr. Zimmerman assessed lower back pain, GERD, and anxiety.  Tr. 1033.  Dr. Zimmerman advised Grycza to continue with back exercises and prescribed Ultram and Protonix.  Tr. 1033

---

[4] During the hearing, Grycza indicated that Dr. Zimmerman was his primary care physician.  Tr. 47.

b.      **Mental impairments**

On July 7, 2009, Grycza sought counseling at Harbor Behavioral Healthcare following his wife's decision to move out and get her own apartment after five years of marriage.[5]  Tr. 556-560.  Grycza indicated he was not certain what his wife intended to do.  Tr.556.  Stressors included his wife leaving, having to move in with his parents, dealing with his daughter's death,[6] not working, financial stress, and chronic low back pain.  Tr. 556.  Grycza was diagnosed with dysthymic disorder; rule out OCD (because of prior diagnosis); and rule out posttraumatic stress disorder (because of prior assault).  Tr. 559-560.  A psychiatric evaluation was recommended. Tr. 560.

On August 13, 2009, Grycza saw Dr. Jean Molitor, M.D., for a psychiatric evaluation. Tr. 561-564.  Dr. Molitor diagnosed major depressive disorder, recurrent severe without psychotic features; generalized anxiety disorder, and rule out OCD and assessed a GAF score of 55.[7]  Tr. 564.  Dr. Molitor prescribed Klonopin to help with anxiety and sleep disturbance and Zoloft to help with depression and anxiety.  Tr. 564.  Grycza saw Dr. Molitor a few weeks later on August 27, 2009.  Tr. 565.  Grycza  denied side effects from the Klonopin and Zoloft and reported some relief in his anxiety symptoms from the medication.  Tr. 565.  However, he requested an increase in his Klonopin because he was feeling anxious in the afternoon.  Tr. 565. Dr. Molitor advised that she would not increase his dosage but he could split his morning tablet

---

[5] Grycza reported having received prior mental health treatment when he was 25 years old.  Tr. 557.  He had been diagnosed with OCD, severe anxiety and depression.  Tr. 557. Also, prior to the alleged onset date, Grycza received some counseling, including marriage counseling.  Doc. 13, pp. 7-8 (referencing Tr. 373-375).

[6] Grycza indicated that two years prior, he and his wife lost their daughter the day before the due date.  Tr. 556.

[7] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

and take one half in the morning and the other half in the afternoon.  Tr. 565.  Dr. Molitor did agree to increase his dosage of Zoloft, which Grycza said was increasing his energy and motivation.  Tr. 565.  Grycza indicated that his wife lost her job so he would be losing his insurance and also his wife had filed for dissolution.  Tr. 565.  Dr. Molitor diagnosed major depressive disorder, recurrent, moderate and generalized anxiety disorder.  Tr. 566.  Grycza's GAF score was again a 55.  Tr. 566.

Grycza saw Dr. Molitor again on September 29, 2009.  Tr. 568-570.  Grycza reported mild improvement in his symptoms but indicated that he was continuing to feel quite depressed and anxious throughout the day.  Tr. 568.  Dr. Molitor increased Grycza's Zoloft dosage and continued Klonopin at the same dosage.  Tr. 568.  Dr. Molitor's diagnoses were unchanged since the August 27, 2009, visit.  Tr. 569.  On October 27, 2009, Grycza saw Dr. Molitor and reported not feeling much improvement following the most recent increase in the Zoloft dosage.  Tr. 571.  Grycza reported not sleeping well at night and that he was poorly motivated to do anything throughout the day.  Tr. 571.  Dr. Molitor increased the Zoloft dosage from 100 mg, 1 tablet daily, to 100 mg  1½ tablets daily; continued the Klonipin, and added Trazadone to help with sleep.  Tr. 571, 573.   Dr. Molitor's diagnoses were unchanged since the September 2009 visit.  Tr. 572.

On July 27, 2011, Grycza was admitted to Arrowhead Behavioral Health for benzodiazepine and opiate dependence.  Tr. 960-977.  He was treated by Dr. Siva Yechoor, M.D.  Tr. 960.  He was having anxiety problems and wanted to detox.  Tr. 960.  His admitting diagnoses were benzodiazepine dependence, opiate dependence, and depression NOS and his

GAF score was 30.[8]  Tr. 960.  Grycza was discharged on August 2, 2011, with diagnoses of polysubstance dependence and depression NOS.  Tr. 960.  His GAF score was 60.  Tr. 960.  He was discharged in stable condition with prescriptions for Suboxone, Prilosec, Elavil, and Neurontin.  Tr. 960, 962.  His prognosis was guarded.  Tr. 962.

As of January 14, 2013, Grycza was continuing treatment by Dr. Yechoor through Arrowhead Behavioral Health's Outpatient Suboxone Program for opiate dependence and was taking Suboxone daily for maintenance of his opiate addiction and attending monthly group therapy and medication management sessions.  Tr. 1029.

### 2.    Medical opinions – physical impairments

#### a.    Treating physicians

##### William Facey, M.D.

On December 31, 2010, Dr. Facey, of the Family Practice of Toledo, completed a medical questionnaire reporting that he first saw Grycza on June 29, 2006, and last saw him on December 31, 2010.  Tr. 698.  Grycza's symptoms included chronic pain in the low back, depression with generalized anxiety and narcotic dependency.  Tr. 698.  His diagnoses included herniated [disc] L4-5, chronic anxiety, and depression.  Tr. 698.  When asked to describe any limitations relating to Grycza's impairments, Dr. Facey indicated "narcotics interfere with his physical and mental function – pain limits his mobility."  Tr. 699.

Dr. Facey completed a second questionnaire wherein he noted that he had last seen Grycza on August 26, 2011.  Tr. 807-808.  Dr. Facey's diagnoses included herniated L4-5 disc, chronic anxiety, depression, and panic attacks.  Tr. 807.  Grycza's symptoms included chronic right leg and low back pain and depression for three to four years.  Tr. 807.  Dr. Facey noted that

---

[8] A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)."  *Id.*

Grycza was off narcotics.  Tr. 807.  Dr. Facey reported that Tylenol and Neurontin provided partial relief and, per physical therapy, Grycza's therapy consisted of a home exercise program. Tr. 808.  As far as limitations caused by Grycza's impairments, Dr. Facey indicated that "pain limits his mobility."  Tr. 808.

### Joy Barnes, M.D.

On May 3, 2012, Dr. Barnes completed a Pain Questionnaire.  Tr. 978-980.  Dr. Barnes's diagnoses included anxiety disorder NOS, depression, and lumbar disc degeneration, noting that the disc degeneration was capable of producing pain.  Tr. 979.  Dr. Barnes indicated that Grycza's subjective complaints included intermittent low back pain and she indicated that those complaints were reasonably derived from his underlying impairment indicating that Grycza had a history of lumbar degenerative joint disease on an x-ray and history of laminectomy and vertebral fusion.  Tr. 979.  Dr. Barnes opined that Grycza's pain affected his ability to do basic work-related activities explaining that his pain impaired his ability to lift objects and sit and stand for prolonged periods of time.  Tr. 979.  Dr. Barnes also indicated that there was a psychological component to his allegations of pain stating that he "has anxiety which can play into the pain."  Tr. 979.  When asked how often Grycza's pain was severe enough to interfere with his attention and concentration, with the options being "never," "seldom," "often," "frequently," and "constantly," Dr. Barnes checked "frequently."  Tr. 979.

On December 6, 2012, Dr. Barnes completed a check-box style medical source statement regarding spinal disorders.  Tr. 1021-1023.  Dr. Barnes listed diagnosis codes 722.52 (degeneration of lumbar or lumbosacral intervertebral disc)[9] and 756.15 (fusion of spine

---

[9] *See* CMS.gov - Centers for Medicare & Medicaid Services – ICD-9 Code Lookup (722.52) http://www.cms.gov/medicare-coverage-database/staticpages/icd-9-code-lookup.aspx?KeyWord=722.52&bc=AAAAAAAAAAEAA%3d%3d& (last visited 6/1/2015)

(vertebra) congenital).[10]  Tr. 1021.  Dr. Barnes indicated that her diagnoses were based on

physical examination, x-rays, medical history, patient's statements and MRI.  Tr. 1021.  Dr.

Barnes checked boxes indicating that there was evidence of nerve root compromise and Grycza

had exhibited neuro-anatomic distribution of pain, limited range of movement of the spine,

motor loss (atrophy with associated muscle weakness, or muscle weakness), and positive

straight-leg raising test (sitting and supine).  Tr. 1021-1022.  Dr. Barnes checked boxes

indicating that Grycza had not exhibited sensory loss or loss of reflexes.  Tr. 1022.  Dr. Barnes

checked boxes indicating that Grycza was limited to sitting less than 30 minutes in an 8-hour

workday and standing/walking less than 30 minutes in an 8-hour workday; could be expected to

lift and carry 0-50 pounds for a "very little" amount of time;[11] and could be expected to perform

the following activities for a "very little" amount of time: push/pull, climb stairs, climb ladders,

stoop/bend, kneel, crouch/squat, and crawl.  Tr. 1022-1023.  Dr. Barnes also opined that

Grycza's impairments or treatment would cause him to be absent from work, on average, three or

more days per month and his impairments and limitations had lasted or could be expected to last

at least 12 months.  Tr.  1023.

### b.  Consultative examining physician

On January 26, 2011, William D. Padamadan, M.D., conducted a consultative internal

medicine evaluation.  Tr. 705-707, 708-715.  Dr. Padamadan indicated that his clinical

examination showed that Grycza's muscle strength and range of motion in both upper and lower

---

[10] *See* CMS.gov - Centers for Medicare & Medicaid Services – ICD-9 Code Lookup (756.15)
http://www.cms.gov/medicare-coverage-database/staticpages/icd-9-code-
lookup.aspx?KeyWord=756.15&bc=AAAAAAAAAAEAA%3d%3d& (last visited 6/1/2015)

[11] The form provided the following choices for rating Grycza's ability to lift/carry and ability to perform various
activities – "never" – "very little" – "about 2 hours" – "about 4 hours" – "about 6 hours" – "unlimited."  Tr. 1022,
1023.

extremities was normal.[12]  Tr. 706-707.  Dr. Padamadan indicated that Grycza was alert and

oriented and his gait was normal.  Tr. 707.

Dr. Padamadan's diagnoses were OxyContin dependence, status post back surgery in

2001, and history of depression (noting that Grycza was scheduled to see a DDS psychologist on

2/4/2011).  Tr. 707.

In his Summary and Functional Status section, Dr. Padamadan opined:

[Grycza's] hearing, speech and sight were within normal limits.  His
communication skills were normal.  His upper extremity functions for reaching,
handling, fine, and gross movements were intact.  Based upon this clinical
evaluation, I do not see any indication for limitation of sitting, standing, walking,
or carrying.  He should be able to lift 10-20 pounds frequently, especially at the
waist level and 20-50 pounds occasionally.  His ADL and IADL activities were
intact.  The extent of his psychiatric status was not evaluated with this
examination.

Tr. 707.

c.      State agency review physicians

*W. Jerry McCloud, M.D.*

On March 16, 2011, state agency reviewing physician Dr. McCloud completed a Physical

RFC Assessment.  Tr. 71-73.   Dr. McCloud opined that Grycza was exertionally limited as

follows: he had the ability to occasionally lift/carry 20 pounds and frequently lift/carry 10

pounds; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday;

and could push/pull unlimitedly, except as shown for lift/carry.  Tr. 72.  In explaining his

exertional limitations, Dr. McCloud noted that Grycza had reported use of (AA) - ambulatory

aids - but also noted that Grycza had not used ambulatory aids during exams and there was no

indication of the need for ambulatory aids.  Tr. 72.  Dr. McCloud also opined that Grycza had

---

[12] Some deviations from "normal" findings were noted on the Manual Muscle Testing form.  Tr. 714 (normal
dorsolumbar spine flexion – 90; Grycza's finding – 80 and normal dorsolumbar spine extention – 30; Grycza's
finding - 20); Tr. 715 (normal knee flexion – 150; Grycza's finding – 130 (right and left active).

postural limitations, including never climbing ladders/ropes/scaffolds due to narcotics use and

frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling.  Tr. 72-

73.  Dr. McCloud also opined that Grycza must avoid all exposure to hazards (machinery,

heights, etc.) due to narcotic use.  Tr. 73.

> ### Maria Congbalay, M.D.

On reconsideration, on August 29, 2011, state agency reviewing physician, Dr.

Congbalay completed a Physical RFC Assessment affirming Dr. McCloud's opinions.  Tr. 104-

106.

> ### 3.       Medical opinions – mental impairments

>> #### a.       Consultative examining psychologist

On February 4, 2011, psychologist Paul A. Deardorff, Ph.D., A.B.P.P., conducted a

psychological consultative evaluation.  Tr. 716-721.  Grycza recounted an assault that occurred

while he was opening up the store where he previously worked.  Tr. 716.  He indicated that he

had been robbed at gunpoint, was pistol whipped, kicked in the back, tied to a chair, and his car

keys were taken.  Tr. 716.  Grycza reported being anxious most of the time, having frequent

panic attacks, and being continually depressed.  Tr. 716-716.  Grycza indicated he avoided

people, particularly crowded and enclosed areas.  Tr. 716.

Dr. Deardorff's diagnoses were major depressive disorder, recurrent, without psychotic

features and posttraumatic stress disorder, chronic.  Tr. 720-721.  Dr. Deardorff assessed a

functional GAF score of 49,[13] noting that Grycza's symptom severity GAF score fell between 51

---

[13] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  See DSM-IV-TR at 34

and 60.[14]  Tr. 720-721.  Dr. Deardorff assessed Grycza's work-related mental abilities in four

categories.  Tr. 721.  Dr. Deardorff opined: (1) Grycza's mental ability to relate to others

including fellow workers and supervisors was moderately impaired by his emotional difficulty

and he would very likely have difficulty relating adequately to others in completing simple

repetitive tasks; (2) Grycza's mental ability to understand, remember, and follow simple

instructions was moderately impaired by his emotional difficulty; he would have no difficulty

understanding simple instructions but his short term memory skills were weak and he might have

difficulty remembering them and his pace may be slowed by his depressive symptomology; (3)

Grycza's mental ability to maintain attention, concentration, persistence, and pace was

moderately impaired by his emotional difficulty and his attention and concentration skills may

deteriorate over extended time periods, slowing his performance in completing simple repetitive

tasks; and (4) Grycza's mental ability to withstand the stress and pressure associated with day-to-

day work activity was markedly impaired by his emotional difficulty; such stress may cause

increased anxiety and decreased attention and concentration but also increased panic attacks and

avoidant behavior; such stress may exacerbate symptomology  suggestive of PTSD, interfering

with his ability to relate adequately to others; and such stress might result in such increased

depressive symptomology as crying, withdrawal, and slowed work performance.  Tr. 721.

### b.    State agency reviewing psychologists

_Karen Steiger, Ph.D.,_

On February 12, 2011, state agency reviewing psychologist Dr. Steiger completed a

Psychiatric Review Technique (Tr. 70) wherein she opined that Grycza's affective disorder and

---

[14] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  _Id._

anxiety disorder caused mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. 70.

Dr. Steiger also completed a Mental RFC Assessment wherein she rated Grycza'a abilities in four main areas.  Tr. 73-75.  In the area of understanding and memory, Dr. Steiger opined that Grycza was moderately limited in understanding and remembering detailed instructions but retained the ability to perform simple, one to two steps tasks.  Tr. 74.

In the area of sustained concentration and persistence, Dr. Steiger opined that Grycza was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and explained that Grycza could attend to tasks in an environment that did not contain frequent interruptions and did not require prioritizing of tasks.  Tr. 74.

In the area of social interaction, Dr. Steiger opined that Grycza was moderately limited in his ability to interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors and explained that Grycza retained the ability to interact with co-workers and supervisors on a superficial level but contact with the general public should be kept to a limited basis.  Tr. 74-75.

In the area of adaptation, Dr. Steiger opined that Grycza was moderately limited in his ability to respond appropriately to changes in the work setting but could perform in a job where changes could be introduced gradually and could be explained and there should be direction as to what is expected of employees.  Tr. 75.

23

_Roseann Umana, Ph.D._

At the reconsideration level, on August 15, 2011, state agency reviewing psychologist Roseann Umana, Ph.D., completed a Psychiatric Review Technique (Tr. 102-103) and Mental RFC (Tr. 106-108).  Dr. Umana's opinions affirmed Dr. Steiger's opinions except that Dr. Umana opined that, notwithstanding Grycza's limitations in understanding and memory, Grycza retained the ability to understand, remember, and carry out simple instructions as well as some that are more complex.  Tr. 106.

**C.**     **Testimonial evidence**

    **1.**     **Plaintiff's testimony**

Grycza was represented by counsel and testified at the hearing.  Tr. 43-58.  He indicated that, in 2008, his back pain caused him pain in his lower back and down his right leg.  Tr. 50.  Notwithstanding his surgery, he indicated that the pain was constant, had not changed much since 2008, and was possibly worse than it had been in 2008.  Tr. 50-51.  Grycza indicated that, in 2008, any sort of lifting, prolonged bending or standing, or any type of exercise made his pain worse.  Tr. 51.  When he worked in 2010 at Little Caesars he was in pain just from being on his feet and walking back and forth. Tr. 51.  Also, when he worked at Sofo Foods, he was in pain from working in a cooler in cold conditions and from being on his feet too long.  Tr. 51.  In 2008 and at present, Grycza indicated that he had numbness and radiating pain in his right leg.  Tr. 52.  As a result, he limps or sometimes he has to stand a minute before he can start walking.  Tr. 52.  Managing stairs is difficult and he could probably walk for only 20 or 30 minutes before being uncomfortable.  Tr. 52.  In order to make himself comfortable, he usually has to lie flat and stretch his leg and back out.  Tr. 52.  Grycza indicated that his ability to sit was worse after his

surgery.  Tr. 53.  Before his surgery, he could sit for about an hour, whereas after, it was difficult for him to sit for longer than a half hour.  Tr. 53.

Grycza was taking Tramadol for the pain in his back.  Tr. 46.  Also, because he had been taking narcotics for the past 11 years, he was taking Suboxone to help with his pain and to keep him from taking too many narcotics.[15]  Tr. 46.  He was taking Protonix for his stomach problems, and his physicians had just switched him from Xanax to Prozac.  Tr. 46.  He was continuing to have a little abdominal pain but it had gotten better following the removal of his gall bladder.  Tr. 49.  He was continuing to have bowel problems, which he attributed mainly to anxiety.  Tr. 49-50.

Grycza can drive but he was without a driver's license having lost it following an accident he was in and not being able to pay the fine to reinstate it. [16] Tr. 48.  His parents drove him to the hearing.  Tr. 48.

Grycza indicated he does not do much during the day.  Tr. 54-55.  His girlfriend is home with him during the day.  Tr. 56.  He gets up in the morning and tries to stretch and get moving and usually soaks in the tub for a little while.  Tr.  55.  He tries to go on a walk in the afternoon and help out at home but he really cannot do much.  Tr. 54, 55.  The furthest he walks is about four or five blocks to the grocery store.  Tr. 55.  His girlfriend usually tries to take care of things because she sees how much pain he is in. Tr. 54.  He showers daily.  Tr. 54.  On some days when the pain is really bad, Gryca is usually just on the couch or lying flat on the floor.  Tr. 54-55.  Grycza estimated that, in a 24-hour period, he is either lying down awake or asleep for about 12

---

[15] Grycza discussed his past problems with over use of narcotics and indicated that he was no longer taking narcotics.  Tr. 49.

[16] Grycza was in an accident, which involved running into a pole.  Tr. 52-53.  Grycza felt that the pain in his leg contributed to the accident because he was trying to hold down the brake pedal but was unable to do so.  Tr. 52-53.

hours.  Tr. 55-56.  His girlfriend goes shopping usually once a week and he will go with her maybe once or twice a month.  Tr. 55.

### 2.    Vocational expert's testimony

Vocational Expert Stephen P. Davis ("VE") testified at the hearing.  Tr.  58-62, 168. The VE testified that Grycza's past work as a CNC operator would be classified as a skilled, medium level job and Grycza performed it at the heavy level.  Tr. 59.

The ALJ asked the VE to assume a hypothetical worker who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for a total of about 6 hours in an 8-hour day with normal breaks; sit for a total of about 6 hours in an 8-hour day with normal breaks; could not climb ladders, scaffolds, etc., crawl or tolerate exposure to hazards such as dangerous machinery and unprotected heights; could occasionally use ramps or stairs, balance, stoop, kneel or crouch; limited to performing jobs that involve understanding or memory and following simple to moderately complex instructions and directions; and performing work that required only occasional, superficial contact with others to perform work duties.  Tr. 59-60.  The VE indicated that the described individual would be unable to perform Grycza's past work.  Tr. 60.  However, there would be light jobs available including (1) table worker, an unskilled, light job with 549,000 jobs available nationally and 63,000 statewide;[17] and (2) parking lot cashier, an unskilled, light job with 198,000 available nationally and 6,100 statewide.[18]  Tr. 60.

For the ALJ's second hypothetical, the ALJ asked the VE to consider the first described individual except that lifting and carrying ability would be limited to 10 pounds occasionally and less than 10 pounds frequently and standing and walking would be limited to a total of about 2

---

[17] The VE indicated that the job numbers provided for table worker accounted for 25% erosion.  Tr. 60.

[18] The VE indicated that there would be no erosion of the job numbers provided for the position of parking lot cashier. Tr. 60.

hours in an 8-hour day with normal breaks.  Tr. 60-61.  The VE indicated that the foregoing changes to the hypothetical would have very little effect on the jobs listed in response to the first hypothetical.  Tr. 61.

For the ALJ's third hypothetical, the ALJ asked the VE to consider the individual in the second hypothetical except that lifting ability would be limited to 10 pounds maximum and only on an occasional basis.  Tr. 61.  The VE indicated that there would be no jobs available.  Tr. 61.

In response to Grycza's counsel's question, the VE indicated that if the individuals described in the first and second hypothetical were to miss more than 3 days per month, they would be unable to perform the jobs listed because, for unskilled work, an individual is limited to one day's absence per month.  Tr. 61.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

27

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[19] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his February 7, 2013, decision, the ALJ made the following findings:

1.      Grycza met the insured status requirements through September 30, 2014. Tr.  17.

---

[19] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

2.      Grycza had not engaged in substantial gainful activity since November 1, 2008, the alleged onset date.  Tr. 17.

3.      Grycza had severe impairments of degenerative disc disease status post multiple surgeries with right lower limb radiculopathy, depression and anxiety. Tr. 18.  Grycza also had non-severe impairments of a left arm injury and cirrhosis of the liver.  Tr. 18.

4.      Grycza did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 19-21.

5.      Grycza had the RFC to perform light work except he could lift or carry 10 pounds occasionally and less than 10 pounds frequently; stand and walk for a total of about 2 hours in a workday with normal breaks; sit for about 6 hours total in a workday with normal breaks; never climb ladders, scaffolds, etc., crawl or tolerate exposure to hazards such as unprotected heights or dangerous machinery; tolerate occasional use of ramps or stairs, balancing, stooping, kneeling or crouching; perform work that required understanding, remembering and following simple instructions and directions in work settings that required no more than occasional, superficial contact with others.  Tr. 21-26.

6.      Grycza had no past relevant work. Tr. 26.

7.      Grycza was born in 1981 and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 26.

8.      Grycza had at least a high school education and was able to communicate in English.  Tr. 27.

9.      Transferability of job skills was not material to the determination of disability.  Tr. 27.

10.     Considering Grycza's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Grycza could perform, including bench work worker and parking lot cashier.  Tr. 27-28.

Based on the foregoing, the ALJ determined that Grycza had not been under a disability from November 1, 2008, through the date of the decision.  Tr. 28.

### V. Parties' Arguments

**A.      Plaintiff's arguments**

Plaintiff argues that the ALJ failed to properly apply the treating physician rule with respect to the two opinions rendered by Dr. Joy Barnes, M.D.[20]  Doc. 13, pp. 19-23; Doc. 18, pp. 1-3.  Relying on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), Plaintiff also argues that the ALJ failed to adequately account for speed and pace-based limitations associated with his moderate limitations in concentration, persistence or pace.  Doc. 13, pp. 23-25; Doc. 18, pp. 3-4.

## B.    Defendant's arguments

With respect to Plaintiff's arguments relating to his physical impairments, Defendant argues that substantial evidence, including the opinions of Drs. Padamadan (consultative examining physician), McCloud (reviewing physician) and Congbalay (reviewing physician); treatment notes; and Grycza's reported activities and presentation at the hearing, supports the physical RFC assessment.  Doc. 16, pp. 16-18.  Defendant also argues that the ALJ complied with the "good reasons" requirement of the treating physician rule and/or error, if any, was harmless.  Doc. 16, pp. 18-21.

With respect to Plaintiff's arguments relating to his mental impairments, Defendant argues that the ALJ adequately accounted for the limiting effects of Plaintiff's mental impairments by restricting him to work requiring understanding, remembering, and following only simple instructions and directions in work settings requiring no more than occasional, superficial contact with others and argues that *Ealy* is distinguishable and does not mandate reversal.  Doc. 16, pp. 21-23.

## VI. Law & Analysis

---

[20] Dr. Barnes rendered two opinions, one dated May 3, 2012, (Tr. 978-980), and one dated December 6, 2012 (Tr. 1021-1027).

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## A.    Reversal and remand required for noncompliance with the treating physician rule

Dr. Barnes provided two medical opinions: one dated May 3, 2012 (Tr. 979-980) and one dated December 6, 2012 (Tr. 1021-1027).[21]  Grycza argues that the ALJ violated the treating physician rule because the ALJ's stated reasons for assigning "little weight" to Dr. Barnes's May 2012 opinion were not good reasons.  Doc. 13, pp. 19-23; Doc. 28, pp. 1-3.  He also argues that the ALJ violated the treating physician rule because he failed to consider or discuss Dr. Barnes's December 2012 opinion.  Doc. 13, pp. 19-23; Doc. 18, pp. 1-3.  The Commissioner argues that

---

[21] Grycza's counsel argued that Dr. Barnes's two medical opinions showed serious physical limitations.  Tr. 57 (referencing Exhibit 55F (May 3, 2012, opinion) and 62F (December 6, 2012, opinion).

substantial evidence supports the ALJ's decision and that the ALJ committed no error in assigning "little weight" to Dr. Barnes's cursory and unsupported opinion regarding Grycza's ability to work.  Doc. 16, pp. 18-21.  The Commissioner contends that the ALJ provided "good reasons," both implicitly and explicitly, for discounting Dr. Barnes's opinion and, although the ALJ did not mention Dr. Barnes's December 2012 opinion, the ALJ's description of Dr. Barnes's opinion in the decision demonstrates that the ALJ considered Dr. Barnes's December 2012 opinion.  Doc. 16, pp. 18-21.  Alternatively, the Commissioner argues that error, if any, by the ALJ with respect to Dr. Barnes's December 2012 opinion was harmless because Dr. Barnes's opinion was so patently deficient that the ALJ could not have credited it and the reasons the ALJ provided for discounting Dr. Barnes's May 2012 opinion apply equally to the December 2012 opinion.  Doc. 16, p. 21.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

If controlling weight is not provided, an ALJ must apply certain factors to determine what weight should be given to the treating source's opinion, and the Commissioner's regulations also impose a clear duty on an ALJ always to give good reasons in the notice of determination or decision for the weight given to treating source opinions.[22]  *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Bowen v.*

---

[22] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. §§ 404.1527(d), 416.927(d).

*Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007) .  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).

Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 939-940 (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).  Inasmuch as 20 C.F.R. § 404.1527 creates important procedural protections for claimants, failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits. *Wilson*, 378 F.3d at 546-547.

In explaining his decision to give "little weight" to Dr. Barnes's May 3, 2012, opinion the ALJ stated:

> The claimant's treating doctor, Joy Barnes, M.D., also completed a functional capacity statement regarding the claimant's impairments.  Dr. Barnes stated that

33

the claimant's pain was frequent severe enough to interfere with attention and concentration, and his pain impaired the ability to lift objects and the ability to sit for prolonged periods of time.  (Ex. 55F)  Dr. Barnes's opinion was not given very much weight.  First, it is unclear what kind of training and education Dr. Barnes received.  There were no related treatment records from Dr. Barnes which limited the claimant in ways consistent with her claims in this functional assessment.  Finally, the claimant's own testimony contradicted the rather severe limitations Dr. Barnes placed on the claimant.   Based on these factors, the undersigned gave Dr. Barnes opinion little weight.

Tr. 26.

The ALJ's explanation as to why he afforded little weight to Dr. Barnes's May 3, 2012, opinion is incomplete because, before deciding that an opinion is inconsistent with the other medical evidence in the record, all the available medical evidence must first be taken into account.  *See Gayheart*, 710 F.3d at 378 ("[A]n ALJ must consider all relevant evidence in the case record.").   Here, the ALJ did not mention or discuss Dr. Barnes's December 6, 2012, opinion.  Thus, it is not clear that the ALJ considered all the relevant evidence when considering and weighing the opinion evidence.

The Commissioner contends that the ALJ's description of the limitations contained in Dr. Barnes's opinion as "rather severe" demonstrates that the ALJ considered Dr. Barnes's December 2012 opinion since the December 2012 opinion was the only opinion wherein Dr. Barnes's quantified Grycza's functional limitations.  Doc. 16, p. 21.  The Commissioner's argument is undermined, however, by the fact that the ALJ identified only one Exhibit, Exhibit 55F, which is Dr. Barnes's May 3, 2012. Tr. 26 (identifying Exhibit 55F when discussing and weighing Dr. Barnes's opinion).  Adding to the uncertainty as to whether the ALJ considered Dr. Barnes's December 2012 opinion is the fact that, at Step Three, the ALJ stated that there was "no evidence the claimant has compromise of nerve root."  Tr. 19.  Yet, in Dr. Barnes's December 6, 2012, opinion, she was asked whether there was "evidence of compromise of the patient's nerve

root (including the cauda equina) or the spinal cord" to which Dr. Barnes's responded "yes."  Tr.
1021.

The Commissioner also contends that the reasons the ALJ provided for discounting Dr.
Barnes's opinion were "good reasons."  Doc. 16, pp. 18-20.  However, the reasons the ALJ
provided for the weight assigned to the May 2012 opinion are unsupported by the record and/or
not sufficiently explained to allow this Court to conduct a meaningful review.[23]  For example,
the ALJ's first reason for providing "little weight" to Dr. Barnes's opinion, i.e., that "it is unclear
what kind of training and education Dr. Barnes received," (Tr. 26), is unsupported by the record.
As reflected in the record, the May 3, 2012, opinion has attached to it a statement from the State
Medical Board of Ohio regarding Dr. Barnes's credentials.[24]  Tr. 980.

Next, the ALJ discounted Dr. Barnes's opinion on the basis that Dr. Barnes did not have
treatment records reflecting limitations consistent with her May 2012 opinion.  Tr. 26.  Dr.
Barnes's treatment records contain subjective complaints of pain, even following surgical
intervention, as well as objective findings reflecting pain with all range of motion testing.  Tr.
953.  During a visit in February 2012, Dr. Barnes observed a slight limp and the need for the use
of a cane.  Tr. 922.  In March 2012, Dr. Barnes noted no mobility limitations and a normal gait
but indicated that Grycza should start physical therapy as soon as possible for his back.  Tr. 953.
She was not willing to prescribe pain pills.  Tr. 953.  Dr. Barnes noted that she felt that Grycza's
anxiety could be contributing to his pain.  Tr. 953.  In March 2012, Dr. Barnes requested a
consultation by Dr. John Dooner, M.D., of Mercy St. Vincent Medical Center, for evaluation of
Grycza's back problems.  Tr. 955-956.  Further, Grycza's medical history demonstrates ongoing

---

[23] The undersigned notes that the ALJ provided the same three reasons for discounting the opinion of Dr. Facey,
another treating source.  Tr. 25.

[24] The Commissioner appears to concede that the ALJ's first reason for discounting Dr. Barnes's opinion was
erroneous.  Doc. 16, p. 19.

problems for which Grycza sought and received treatment, including surgical intervention for his back problems.  It is not clear how the ALJ factored in medical evidence, other than Dr. Barnes's treatment records, when assessing the consistency of Dr. Barnes's opinion with the record as a whole.

The ALJ's final reason for discounting Dr. Barnes's May 2012 opinion was that "the claimant's own testimony contradicted the rather severe limitations Dr. Barnes placed on the claimant." Tr. 26.  However, the ALJ acknowledged that Grycza testified that he suffered from constant pain; his medications prevented him from working; due to his pain, his entire right leg went numb and he had trouble driving; his pain continued to worsen as have his mental health symptoms and no amount of surgery or treatment had improved his pain.[25]  Tr. 22.   In light of the ALJ's description and acknowledgement of Grycza's testimony regarding the severity of his symptoms, the ALJ should have provided a more complete explanation as to how Grycza's testimony served to discredit Dr. Barnes's opinion.  Without a more thorough explanation, the Court is unable to assess whether the ALJ's reason was in fact a "good reason" and supported by the evidence.[26]

An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole,*

---

[25] When indicating that that he found inconsistencies among statements made by Grycza, the ALJ noted that Gryzca stated that he could not sit for long periods of time and often had to get up to stretch to alleviate his pain but was able to sit throughout the hearing, which lasted nearly one hour.  Tr. 23.  Contrary to the ALJ's statement, however, during the hearing, Grycza did stand (Tr. 56 (ATTY: You can stand up.  CLMT: Yeah, thank you. ATTY: Just raise the microphone up) and the hearing lasted closer to a half hour rather than one hour (Tr. 41 (hearing commenced 8:27 a m.) and Tr. 63 ( hearing closed 9:05 a.m.)).

[26] To the extent that the ALJ was referring to Grycza's reported daily activities such as cleaning his home, doing household chores, and mowing the lawn (Tr. 24), the ALJ should have nonetheless more clearly explained how those activities, which Grycza reported were performed not very often or very slowly (Tr. 272- 273), discredited Dr. Barnes's opinion.  *See e.g., Melendez v. Comm'r of Soc. Sec.*, 2014 WL 2921938, * 4-6 (N.D. Ohio June 27, 2014) (noting that, while the ALJ was not required to find a claimant's statements credible, when discounting a treating source's opinion solely based on the claimant's reported daily activities, the ALJ should have discussed those activities more thoroughly).

661 F.3d at 939-940.  Here, the ALJ's failure to discuss or assign weight to Dr. Barnes's

December 2012 opinion coupled with an insufficient explanation for the weight assigned to Dr.

Barnes's May 2012 opinion make it impossible for the Court to assess whether there is

substantial evidence to support the ALJ's decision.  *Cole*, 661 F.3d at 939-940; *see also Wilson*,

378 F.3d at 546-547.  Accordingly, reversal and remand is warranted to ensure adherence to the

treating physician rule.

      The Commissioner argues that the ALJ's failure to discuss Dr. Barnes's December 2012

opinion should be deemed harmless error because that opinion is so patently deficient that the

ALJ could not possibly have credited it.  Doc. 16, p. 21.  Harmless error may apply in some

treating physician situations but only (1) if the opinion is so "patently deficient that the

Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the

treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner

has met the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the

regulation."  *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (citing *Friend v. Comm'r of Soc.

Sec.*, 375 F. App'x. 543, 551 (6th Cir. 2010).  Although Dr. Barnes's December 2012 opinion

consists of check box answers, Dr. Barnes indicated that her opinion was based on physical

examination, medical history, patient's statements, x-rays, and MRI.[27]  Tr. 1021.   Further,

considering the ALJ's complete lack of discussion regarding Dr. Barnes's December 2012

opinion in addition to the above discussed deficiencies in the ALJ's consideration of Dr.

Barnes's May 2012 opinion, a finding of harmless error is not warranted in this instance.

Moreover, while a check-box type opinion may not be entitled to controlling weight, the ALJ did

not discount the opinion on the basis that it was a check-box form and the Commissioner has

---

[27] A December 6, 2011, MRI of Grycza's lumbar spine showed "disk osteophyte complex L4-5 resulting in moderate to severe right foraminal narrowing and mild to moderate left foraminal narrowing."  Tr. 873.  The MRI also showed "mild central disc bulging at L5-S1 without central or foraminal stenosis." Tr. 873

failed to demonstrate that a check box form is patently deficient such that an ALJ is not required to consider or discuss the opinion.  *See Coy v. Astrue,* 2012 WL 5497850, * 8 (N.D.Ohio Nov.13, 2012) (rejecting the Commissioner's argument that the ALJ was free to disregard a physician's opinion simply because it was contained in a "check-a-box" type form).

## B.     Reversal and remand required for further RFC and Step Five analysis

Relying on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), Grycza argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to adequately account for his mental limitations in the RFC or VE hypothetical upon which the ALJ relied to support his Step Five determination.  Doc. 13, pp. 23-25; Doc. 18, pp. 3-4.

The ALJ limited Grycza mentally in the RFC to performing "work that required understanding, remembering and following simple instructions and directions in work settings that required no more than occasional, superficial contact with others." Tr. 21.  Grycza contends that additional mental limitations beyond the foregoing were required because the ALJ found moderate limitations in concentration, persistence or pace and gave "substantial weight" to the opinions of state agency reviewing psychologists who opined that Grycza required a work environment without frequent interruption, without prioritizing tasks, and with changes introduced gradually.[28]  Doc. 13, pp. 23-25; Doc. 18, pp. 3-4.

To satisfy his burden at Step Five, the Commissioner must make a finding "supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response

---

[28] Plaintiff also indicates that the state agency consultative psychologist Dr. Deardorff found that Grycza was moderately impaired in his ability to maintain attention, concentration, persistence and pace and may slow his performance in completing simple, repetitive tasks.  Doc. 13, pp. 24-25 (referencing Tr. 721).  The ALJ gave Dr. Deardorff's opinion "some weight" in determining Grycza's RFC. Tr. 26.

to a hypothetical question." *Id.* (citation omitted).  However, if an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations.  *Id.; Ealy*, 594 F.3d at 516-17; *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do").

In *Ealy*, the ALJ found that the claimant had moderate difficulties in concentration, persistence and pace but the ALJ did not ask the vocational expert a hypothetical containing a fair summary of those restrictions.  594 F.3d at 516-17.  Instead, the ALJ's hypothetical only limited the claimant to simple, repetitive tasks and instructions.  *Id.*  The Sixth Circuit concluded that the hypothetical did not adequately describe the claimant's limitations and, as a result, the vocational expert's testimony did not constitute substantial evidence in support of the ALJ's Step Five determination.  *Id.*

Here, the ALJ concluded at Step Three that Grycza had moderate difficulties in concentration, persistence or pace.  Tr. 20.  While Step Three findings are not an RFC assessment, in formulating Grycza's RFC, the ALJ considered and weighed medical opinion evidence.  Tr. 24-26.  In doing so, the ALJ gave "substantial weight" to the opinions of state agency reviewing psychologists Dr. Steiger and Dr. Umana who opined that, among other limitations, Grycza was moderately limited in his "ability to maintain attention and concentration for extended periods" and in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  Tr. 24, 89, 106-107.  In addition, in explaining their opinions regarding Grycza's limitations, Drs. Steiger and Umana stated that

Grycza could "attend to tasks in an environment that does not contain frequent interruptions and does not require prioritizing of tasks."  Tr. 89, 107.  Further, consultative examining psychologist Dr. Deardorff also offered opinions regarding Grycza's mental abilities including his opinions that Grycza's "pace may be slowed due to his depressive symptomology" and that Grycza's attention and concentration skills were not strong during the evaluation and "may deteriorate over extended time periods, slowing his performance in completing repetitive tasks."  Tr. 721. The ALJ considered Dr. Deardorff's opinion and gave it "some weight." Tr. 26.

In light of the foregoing, Grycza contends that the ALJ's RFC does not adequately account for the limitations found by Drs. Steiger and Umana, the limitations found by Dr. Deardorff, and/or the ALJ's finding that Grycza had moderate difficulties in the area of concentration, persistence or pace and reversal and remand is warranted under *Ealy*.

Although *Ealy* does not establish a bright-line rule as to how an ALJ must accommodate moderate limitations in concentration, persistence or pace, it is instructive.  The undersigned concludes that, *w*ithout more explanation in the ALJ's decision, it is unclear how the RFC limitation restricting Grycza to "work that required understanding, remembering and following simple instructions and directions in work settings that required no more than occasional, superficial contact with others" (Tr. 21) adequately accounted for the limitations found by Drs. Steiger and Umana, which were afforded "substantial weight" by the ALJ, the limitations found by Dr. Deardorff, which were afforded "some weight" by the ALJ, and/or the ALJ's finding that Grycza had moderate limitations in concentration, persistence or pace.[29]

---

[29] Even if the Court were to determine the RFC assessment adequately accounted for Grycza's mental limitations, substantial evidence to support the Step Five finding may nonetheless be lacking because the VE hypothetical upon which the ALJ relied appears to be less restrictive than the RFC assessment.  For example, the ALJ asked the VE to assume an individual having the capability to perform jobs that involved following "*simple to moderately complex* instructions and directions. . ." Tr. 60 (emphasis supplied).  However, the ALJ limited Grycza in the RFC to performing jobs that involved following "*simple* instructions and directions . . ."  Tr. 21 (emphasis supplied).

Further, while "an ALJ is not required to adopt every opinion expressed by a non-examining medical expert, even when an ALJ overall accords that opinion great weight," *Schulte v. Colvin*, 2014 WL 1654129, *5 (N.D. Ohio Apr. 24, 2014), if a medical source's opinion contradicts the ALJ's RFC finding, an ALJ must explain why he did not include the medical source's limitation in his RFC determination.  *See* Social Security Ruling 96–8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); *see also Thompson v. Comm'r of Soc. Sec. Admin.*, 2014 WL 356974, *4 (N.D. Ohio Jan. 31, 2014) (case remanded because ALJ failed to explain why she did not adopt in the RFC a conflicting limitation assigned by medical sources); *Moretti v. Colvin*, 2014 WL 37750, *10 (N.D. Ohio Jan. 6, 2014) (case remanded because the ALJ failed to explain why she did not include in the RFC a limitation assigned by a medical source).

Here, although Drs. Steiger, Uamana and Deardorff opined that Grycza would have limitations maintaining sustained concentration and persistence and required a work environment with no frequent interruptions, no prioritizing tasks, and with changes introduced gradually, and "substantial" or "some" weight was assigned to those opinions, the RFC does not appear to contain those limitations.[30]  Thus, the ALJ should have explained why the RFC did not include those limitations or, alternatively, how the RFC adequately accounted for those limitations.

---

[30] The Commissioner argues that Drs. Steiger and Umana's limitations – no frequent interruptions and no prioritizing of tasks – did not relate to "duration" or "pace" and therefore no further RFC limitations were required. Doc. 16, p. 23.  A review of Drs. Steiger and Umana's opinions, however, reflect that their opinions pertained to the area of *sustained concentration and persistence*.  Tr. 74, 106-107 (emphasis supplied).  Further, one of the categories rated under *sustained concentration and persistence* was "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent *pace* without an unreasonable number and length of rest periods," a category rated by both physicians as "moderately limited." Tr. 74, 107 (emphasis supplied).

Without such a discussion, the undersigned is unable to determine whether the RFC assessment and Step Five finding are supported by substantial evidence.[31]

Based on the foregoing, the undersigned recommends that this matter be reversed and remanded for an explanation as to how the ALJ adequately accounted for moderate limitations in concentration, persistence and pace, why the ALJ did not include Drs. Steiger, Umana, and Deardorff's pace-based limitations in the RFC, and/or how the RFC assessment is consistent with those opinions such that further RFC limitations were not required.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED**.[32]

June 2, 2015

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[31] The Commissioner contends that the RFC is consistent with the opinions of Drs. Steiger and Umana, arguing that the RFC limitation of simple instructions accounted for their opinion that Grycza required a work environment with no requirement of prioritizing tasks and the RFC limitation of only occasional and superficial contact with others accounted for their opinion that GryczGryczaa required a work environment with no frequent interruptions.  Doc. 16, p. 22.  The Commissioner acknowledges that the RFC is not consistent with Dr. Deardorff's opinion but argues that the RFC is nonetheless supported by substantial evidence because Drs. Steiger and Umana concluded that Dr. Deardorff overstated the severity of Grycza's limitations.  Doc. 16, p. 22, n.2.  Since the ALJ did not provide such an explanation, the undersigned is unable to assess the supportability of the Commissioner's position.  *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 192 (6th Cir. 2009) (a reviewing court must assess the propriety of the administrative agency's action on the grounds invoked by the agency) (citing *SEC v. Cherney Corp.*, 332 U.S. 194, 196 (1947)).  For example, without explanation from the ALJ, the undersigned cannot determine whether the limitation regarding contact with others was included to account for the need to work in an environment with no frequent interruptions, i.e., a concentration and persistence limitation, or to account for limitations in social interaction.

[32] This recommendation should not be construed as a recommendation that, on remand, Grycza be found disabled.

42